## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br>**100 F Street, N.E.**<br>**Washington D.C. 20549-6030** | :<br>:<br>:   **Civil Action No.**<br>: |
| **Plaintiff,** | :<br>: |
| v. | :<br>: |
| **SURE TRACE SECURITY CORPORATION**<br>1615 Walnut Street, 3rd Floor<br>Philadelphia, PA 19103,<br>**MICHAEL M. CIMINO, AND PETER**<br>**LEEUWERKE**<br>        **Defendants.** | :<br>:<br>:<br>:<br>: |

### COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges that:

### SUMMARY

1.  This case involves Sure Trace Security Corporation's ("Sure Trace" or the "company") issuance of fraudulent press releases and its repeated attempts to evade registration requirements.

2.  In 2004, Sure Trace issued a press release claiming that the company had signed a contract for $6 million; and two press releases claiming that the company was about to acquire Sensor Media Corporation, a company with alleged sophisticated technology.

3.  These releases were false or materially misleading. Sure Trace had not signed a contract for $6 million as reported. In addition, Sure Trace omitted material facts by failing to

disclose that Sensor Media was controlled by a related party and only had an unfinished prototype for a product.

4.    Peter Leeuwerke ("Leeuwerke") drafted each of the press releases that were issued. Leeuwerke was a consultant for Sure Trace at the time the releases were issued, and had previously served as Sure Trace's chief executive officer. Leeuwerke knew, or was reckless in not knowing, that each release was materially false and misleading.

5.    Sure Trace also made several attempts to evade securities registration requirements. From 2002 to 2003, Sure Trace attempted to use at least three Forms S-8 to register the issuance of stock, purportedly to give to its employees and consultants under the auspices of various employee stock option plans. Many of the shares Sure Trace registered on Forms S-8 and issued to "consultants" were never intended to compensate the so-called "consultants" for their services, but rather were designed from the outset to make a market in the company's stock.

6.    Sure Trace also violated the registration requirements of the Securities Act of 1933 ("Securities Act") in May 2006 when it spun off shares of its subsidiary, True Product ID ("TPDI"). Michael Cimino ("Cimino"), Sure Trace's current vice-chairman and president, effected the spin-off

7.    As a result of this conduct, Sure Trace violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Sections 5(a) and 5(c) of the Securities Act. Leeuwerke violated, and aided and abetted violations of, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and violated Sections 5(a) and 5(c) of the Securities Act. Finally, Cimino violated sections 5(a) and 5(c) of the Securities Act.

2

## JURISDICTION AND VENUE

8.     This court has jurisdiction over this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e) and 78aa]. Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9.     Venue is appropriate in this Court under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain acts or transactions constituting the violations by the defendants occurred in this district.

## DEFENDANTS

10.     Sure Trace Security Corporation is a publicly traded Utah corporation with principal executive offices that have moved from British Columbia to Denver to Philadelphia in the past three years. According to its website, Sure Trace is "in the business of bringing advanced security technologies and solutions to the global marketplace." Sure Trace is a voluntary filer with the Commission. Its common stock was traded over-the-counter and quoted in the Pink Sheets under the symbol "SSTY" until August 3, 2005, when the Commission suspended trading in Sure Trace stock. The stock now trades in the inter-dealer market.

11.     Peter Leeuwerke, age 47, is a Canadian citizen. He acted as chief executive officer of Sure Trace from approximately October 2002 until March 2004. From April 2004 through March 2006, he served as a consultant for Sure Trace. Leeuwerke has a fifty percent ownership interest in Sensor Media Corporation.

3

12.     Michael Cimino, age 54, has served as Sure Trace's president and vice-chairman since May 2005.

## RELEVANT PERSONS AND ENTITIES

13.     True Product ID ("TPDI") is a former subsidiary of Sure Trace, whose shares Sure Trace spun off to Sure Trace shareholders in May 2006.  TPDI was issued the rights to distribute all of Sure Trace's products.  TPDI has a class of securities registered under Section 12(g) and is current in filing its periodic reports.  TPDI's principal executive offices are located in Philadelphia, PA and its common stock is traded over-the-counter and quoted under the symbol "TPDI."

14.     Sensor Media Corporation ("Sensor Media") is a Canadian company in which Leeuwerke has a fifty percent ownership interest.  Sensor Media describes itself as a biotechnology firm specializing in thumb print identification technologies and the solar panel business.

## FACTS

### I.     BACKGROUND

15.     Sure Trace is a development stage company that sold technology that allows "tags" or identification images to be permanently imprinted on an object that could later be verified for authenticity through a scanning device.  During the relevant time, Sure Trace had no sales and was focused on generating sales opportunities.  Most of Sure Trace's business projects were concentrated in Canada, the Philippines, China and France.

16.     From 2002 to 2005, the company underwent a series of managerial changes. Leeuwerke acted as chief executive officer from approximately October 2002 until April 2004. From April 2004 through March 2006, he served as consultant for Sure Trace.   Cimino has

served as president and vice-chairman of Sure Trace since May 2005. Another individual served as president from May 2004 to March 2005 (hereinafter referred to as "Former President"). A second individual served as the chairman of the board from April 2004 until November 2006 (hereinafter referred to as "Former Chairman").

17.    On or about August 3, 2005, the Commission ordered a suspension of trading in the stock of Sure Trace because of questions surrounding the accuracy and adequacy of publicly disseminated information concerning, among other things, the status of Sure Trace's negotiations to sell its technology to other entities.

## II.    SURE TRACE'S FALSE AND MISLEADING PRESS RELEASES
### A.    The $6 Million Dollar Contract Press Release

18.    From at least May 2004 to March 2005, Sure Trace press releases generally were drafted by the employee who was responsible for the particular project discussed in the release. The designated employee would report any major events regarding his or her project to Sure Trace's president and compliance officer. The employee would then draft the release and send it to the president for review. The draft would also be reviewed by Sure Trace's investor relations firm for any grammatical errors. The releases were not reviewed by any legal counsel.[1]

19.    On September 14, 2004, Sure Trace issued a press release announcing that it had "signed a contract for US$6,000,000 gross annual revenue." The release stated that Sure Trace was "pleased to announce that it is moving from the proof of concept phase of its development to commercial viability," and it expected "to begin delivery to the customer before year-end."

---

[1]    These practices changed once Cimino became president.

5

20.    At the time of this release, Sure Trace was a development-stage company with very few clients, and its confirmation to the public that it had entered into a contract to deliver an actual product (versus a conceptual product) to a customer had a noticeable effect on the market.

21.    This press release caused the price and trading volume of Sure Trace's stock to rise significantly. On September 13, 2004, 230,550 Sure Trace shares traded at a high price of .115. The next day, after this release was issued, more than 1.8 million shares traded at a high of .13, for a volume increase of nearly 800% and a price increase of nearly 8%.

22.    The release was false. Sure Trace did not have a signed contract for $6 million. In addition, the company was not in any position to "begin delivery to the customer" as stated in the press release because its products had not yet been manufactured.

23.    Leeuwerke drafted the press release and had it issued. However, Sure Trace had not secured any such contract.

24.    Leeuwerke never received a signed contract for $6 million. Therefore, Leeuwerke knew, or was reckless in not knowing, that the press release was false and misleading because Sure Trace had not signed a contract for $6 million dollars. Leeuwerke also knew that Sure Trace did not have the ability to deliver any products to anyone by year-end.

**B.    Acquisition of Sensor Media Corporation Press Releases**

25.    In the summer of 2004, Leeuwerke was negotiating with Sure Trace to sell them his company, Sensor Media. On August 26, 2004, Sure Trace issued a press release, drafted by Leeuwerke, announcing that it had "commenced negotiations for the acquisition of a biotechnology firm specializing in thumb print identification technologies." According to this release, Sure Trace intended to close this acquisition by the end of the third quarter of 2004, and

Sure Trace viewed the undisclosed company's technology "as a substantial improvement over other thumb print technologies that require a central database to be effective."

26.    This news was relevant to Sure Trace investors because Sure Trace's product needed a cost effective means to scan and identify its "tags" while this thumb print technology did not require expensive scanners.

27.    On the day of the release, Sure Trace's stock volume increased 46% to 1.1 million from 500,000 the day before, and its price increased by 9%.

28.    The release omitted material facts that made the release false and misleading.  The release failed to state that the company to be acquired belonged to Leeuwerke — an affiliated party — and that the name of the company was Sensor Media.  The release also failed to disclose that Sensor Media had no paying customers, and that Sensor Media only had an unfinished prototype for a product.

29.    Finally, the release failed to state anything about the terms of the proposed deal, which required Sure Trace to pay 24 million shares of its stock and over $500,000 to acquire Sensor Media.

30.    Leeuwerke knew, or was reckless in not knowing, that the press release was false and misleading because it did not disclose material facts, including his affiliation with Sensor Media and that Sensor Media had no paying customers and only had an unfinished product prototype.

C.    **Sure Trace Issues Second Press Release Concerning Sensor Media Acquisition**

31.    On December 27, 2004, Sure Trace issued another press release updating the status of its negotiations with the same "biometric fingerprint company."  The release discussed

at great length Sure Trace's negotiations with "the principal" of the "biometric fingerprint company."

32.     Leeuwerke also drafted this release.  Like the August release, this release omitted materials facts that made the release false and misleading.  The release never disclosed that Leeuwerke himself was the "the principal" and that he was negotiating on both sides of the transaction.  The release also failed to disclose the terms of the deal and that Sensor Media had no paying customers, and only had an unfinished product prototype.  Ultimately, Sure Trace never acquired Sensor Media.

33.     Leeuwerke knew, or was reckless in not knowing, that the press release was false and misleading because it did not disclose materials facts, including his affiliation with Sensor Media and it failed to disclose material information about Sensor Media's operations.

34.     At the time these three press releases were publicly issued, there was a reasonable expectation that the publicly disseminated information would cause reasonable investors to buy or sell Sure Trace securities in reliance thereon.

## III.    SURE TRACE REPEATEDLY VIOLATES THE REGISTRATION REQUIREMENTS

### A.    The Registration History of Sure Trace

35.     Sure Trace's predecessor, White Cloud Exploration, Inc. ("White Cloud"), was formed in July 1983 as a developmental stage shell company.  It remained essentially inactive until March 1991, when it filed a Form 15 terminating its registration pursuant to Section 12(g) of the Exchange Act.

36.    White Cloud filed nothing further until July 1997, when it filed eight 10-Ks and 10-Qs all at once in an effort to become current in its reporting. However, because White Cloud had terminated its Exchange Act registration, and had never had an effective registration under the Securities Act, it was, and remained, a voluntary filer.

37.    In March 2001, White Cloud entered into a reverse merger with Cormax Business Solutions, Inc., which became Sure Trace after it entered into a reverse merger with a company called Identechs around the end of 2002.

38.    However, after the 1991 registration termination, Sure Trace, and its corporate predecessors, never registered a class of securities with the Commission under Section 12 of the Exchange Act nor did it have a valid registration statement become effective under the Securities Act. Thus, Sure Trace has at all times been a voluntary filer with no obligation to file periodic reports under Section 13 or 15(d) of the Exchange Act.

**B.    Misuse of Forms S-8**

39.    From 2002 to 2003, Sure Trace attempted to use at least three Forms S-8 to register the issuance of stock, purportedly to give to its employees and consultants under the auspices of various employee stock option plans. Sure Trace filed Forms S-8 on March 8, 2002 for 30 million shares, on December 26, 2002 for 33 million shares, and on February 10, 2003 for 20 million shares. The Chief Executive Officer at that time (hereinafter "Former CEO") who resigned in October 2002, signed the March 8 Form S-8 on behalf of Sure Trace. Leeuwerke signed the December 26 and February 10 Forms S-8 on behalf of Sure Trace.

40.    Offerings are permitted to be registered on Form S-8, which is effective immediately upon filing, to employees and consultants performing *bona fide* services. Use of

this shortened registration form is conditioned on several prerequisites, including that the registrant be subject to the reporting requirements of Section 13 or 15(d) and has filed all reports required by those sections during the preceding 12 months. More importantly, Form S-8 is available for the issuance of securities to consultants or advisors only if, among other things, the services are not in connection with the offer or sale of securities in a capital-raising transaction, and do not directly or indirectly promote or maintain a market for the registrant's securities. [2]

41.    Because Sure Trace was not a registrant subject to the reporting requirements of Sections 13 or 15(d) of the Exchange Act, it was not eligible to register the issuance of stock using a Form S-8 in violation of Sections 5(a) and 5(c) of the Securities Act.

42.    Further, many of the shares Sure Trace registered on Forms S-8 and issued to "consultants" were never intended to compensate the "consultants" for the performance of *bona fide* services. Rather, the issuance of shares was designed from the outset to raise capital and to promote and maintain a market in Sure Trace's securities. This was also in violation of Sections 5(a) and 5(c) of the Securities Act.

43.    On March 8, 2002, the Former CEO signed a Form S-8 and on July 24, 2002, the Former CEO issued 1.5 million shares to himself pursuant to the Form S-8. The Former CEO thereafter sold these shares. All told, from 2000 to 2003, Sure Trace issued the Former CEO at least 18 million shares, all but 80,000 of which were sold into the market thereafter.

44.    Sure Trace also used the stock issued through Forms S-8 to raise capital. On December 26, 2002, Leeuwerke signed a Form S-8 on behalf of Sure Trace and then had shares issued to an alleged consultant in exchange for capital. Between January 3, 2003 and November

---

[2]    See General Instructions for Form S-8, Federal Securities Laws (CCH) ¶ 8141, at 7231.

17, 2003, the alleged consultant ("Consultant") gave Sure Trace $783,750 in exchange for

19,170,879 shares of "free trading" Form S-8 stock pursuant to its "2003 Special Stock Option

Plan."    The Consultant sold these shares into the market.    Thus, the Consultant was providing

Sure Trace with funding in exchange for shares priced below market, ostensibly in exchange for

"consulting services."

45.    Many of the shares that Sure Trace issued to employees and "consultants"

pursuant to the Forms S-8 were never intended to compensate the employees and "consultants"

for their services, but rather were designed from the outset to make a market in the company's

stock.    The Former CEO and the Consultant were little more than conduits through which Sure

Trace distributed free-trading stock to outside investors.    The true transaction, namely the sale of

these shares to the public, was never registered.    Sure Trace misused the Form S-8 registration

process as a means of avoiding the scrutiny and expenses associated with formal registration in

violation of Sections 5(a) and 5(c) of the Securities Act.    Leeuwerke violated Sections 5(a) and

5(c) by arranging for the issuance of shares to an alleged consultant for purposes of raising

capital for Sure Trace.

**C.    Sure Trace Fails to Register the Spin-Off of TPDI**

46.    On February 10, 2006, Sure Trace, now trading on the "inter-dealer" market as a

result of its August 2005 trading suspension, announced its intent to acquire a controlling interest

in a reporting shell company, which it later identified as ONTV Inc. ("ONTV"), a bulletin board

company incorporated in Delaware.

47.    In exchange for $500,000 and a master license to develop Sure Trace's anti-

counterfeiting technology, Sure Trace received over 75% of ONTV's common and preferred

stock.

48.    In the February 10, 2006 press release, the company also disclosed its plan to spin off the shares in the new subsidiary to its own shareholders. Cimino stated in the press release that the spin-off would "allow Sure Trace shareholders to hold, in addition to their shares in Sure Trace, shares in the acquired company, for which there will be publicly disclosed bids and asks, as well as other features in the OTCBB."

49.    On March 17, 2006, Sure Trace announced that the acquisition had closed and shortly thereafter ONTV's name was changed to True Product ID, Inc ("TPDI"), which currently trades on the bulletin board under the symbol "TPDI."

50.    On May 25, 2006, as previously announced, Sure Trace spun off restricted TPDI stock to its shareholders at a ratio of 1 share for each 19 shares of Sure Trace stock owned.[3] At the time, Sure Trace had over 800 shareholders of records.

51.    Sure Trace's spin-off of TPDI shares constituted a primary offering in which Sure Trace acted as an underwriter and TPDI the issuer. There was one transaction in this distribution with two parts. First, Sure Trace acquired TPDI shares. Second, two months later, Sure Trace spun off the TPDI shares to over 800 of its shareholders. Sure Trace's acquisition of TPDI was clearly made with the view of distributing TPDI stock to Sure Trace shareholders. When Sure Trace announced it was acquiring TPDI's predecessor ONTV on February 20, 2006, it also disclosed its plan to spin off the shares of the new subsidiary to its shareholders.

52.    Sure Trace's acquisition of TPDI shares and the subsequent distribution of those shares constituted a sale and as such, should have been registered absent a valid exemption. Its decision to acquire a controlling interest in TPDI and the subsequent distribution of TPDI shares

---

[3]    On May 4, 2006, TPDI increased its authorized shares of common stock from 100,000,000 shares to 1,000,000,000 shares. Four days later, TPDI declared a 2 for 1 split of its common stock.

12

to its shareholders was part of a plan to avoid registration. Since Sure Trace did not have a valid exemption from the registration requirements, it violated Sections 5(a) and 5(c) of the Securities Act. In this case, Sure Trace's shareholders, did not have access to the quality of information typically associated with the registration of a primary offering.

53.    Cimino was a necessary and substantial participant in the acquisition of TPDI and the unlawful distribution of TPDI shares after some consultation with counsel. Cimino stated that since the Commission suspended trading in Sure Trace's stock, there was no active market for the stock and the company was unable to raise capital. According to Cimino, management concluded that "the best solution [for Sure Trace's shareholders] was to do a transaction whereby Sure Trace's business opportunities were placed in a separate reporting company in which Sure Trace's existing shareholders would have the largest stake." Cimino had a primary role in negotiating Sure Trace's acquisition of TPDI and approving the spin-off of TPDI's shares to Sure Trace's shareholders in violation of Sections 5(a) and 5(c) of the Securities Act.

## FIRST CLAIM
### Anti-Fraud Violations
Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and
Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

54.    Paragraphs 1 through 53 above are realleged and incorporated by reference.

55.    As alleged above, Sure Trace and Leeuwerke, directly or indirectly, acting intentionally or recklessly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the offer, sale, or purchase of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make the

13

statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

56.    By reason of the foregoing, Sure Trace and Leeuwerke violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

57.    As alleged above, Leeuwerke also knowingly or recklessly provided substantial assistance to Sure Trace in connection with the company's violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

58.    By reason of the foregoing, Leeuwerke aided and abetted Sure Trace's violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

## SECOND CLAIM
### Reporting Violations
Violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)].

59.    Paragraphs 1 through 58 are realleged and incorporated by reference.

60.    As alleged above, Sure Trace, Leeuwerke, and Cimino have, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, offered to sell or sold securities or carried or caused such securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

61.    No registration statement was filed with the Commission or was in effect with respect to the securities offered by Sure Trace prior to the offer or sale of these securities.

62.    By reason of the foregoing, Sure Trace, Leeuwerke, and Cimino violated Sections 5(a) and 5(c) of the Securities Act.

### PRAYER FOR RELIEF

Wherefore, the SEC respectfully requests that this Court enter a final judgment:

### I.

### Permanent Injunctive Relief
(Defendants Sure Trace, Leeuwerke, and Cimino)

(a)    Permanently enjoining Defendants Sure Trace and Leeuwerke from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

(b)    Permanently enjoining Defendants Sure Trace, Leeuwerke, and Cimino from violating Sections 5(a) and 5(c) of the Securities Act.

### II.

### Disgorgement
(Sure Trace and Leeuwerke)

(a)    Ordering Sure Trace to pay disgorgement of $933,750, plus-prejudgment interest of $165,150.75, representing the benefit from the conduct alleged herein.

(b)    Ordering Leeuwerke to pay disgorgement plus pre-judgment interest representing the benefit from the conduct alleged herein.

## III.

### Civil Money Penalties

(Sure Trace and Leeuwerke)

(a)  Ordering Sure Trace and Leeuwerke to pay a penalty pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)].

Dated:  September _10_, 2007

Respectfully submitted,

Cheryl J. Scarboro (D.C. Bar No.  422175)
Tracy L. Price
N. Creola Harry

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-6030
(202) 551-4403 (Scarboro)

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-6030

**DEFENDANTS**

Sure Trace Security Corporation, Peter Leeuwerke
and Michael M. Cimino

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___Philadelphia, PA___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Cheryl J. Scarboro, Esq., Tracy L. Price, Esq.,
N. Creola Harry, Esq.
100 F Street, NE
Washington, DC 20549-6030
(202)551-4403 (Scarboro)

ATTORNEYS (IF KNOWN)

See Attachment A

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

◉ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◉ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| O   **G. Habeas Corpus/ 2255** | O   **H. Employment Discrimination** | O   **I. FOIA/PRIVACY ACT** | O   **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O   **K. Labor/ERISA (non-employment)** | O   **L. Other Civil Rights (non-employment)** | O   **M. Contract** | O   **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

See Attachment B

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** [_____] Check YES only if demanded in complaint<br>**JURY DEMAND:**    YES ☐    NO ☒ |
|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE *10 Sep 07*    SIGNATURE OF ATTORNEY OF RECORD *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Civil Cover Sheet Attachment A

**U.S. Securities and Exchange Commission v. Sure Trace Security Corporation et al.**

**Counsel for Defendants:**

Defendant, Sure Trace Security Corporation

Richard E. Brodsky, Esq.
Squire, Sanders & Dempsey L.L.P.
200 South Biscyane Blvd., Suite 4000
Miami, FL 33131-2398
rbrodsky@ssd.com

Defendant, Peter Leeuwerke
*Pro Se*
Unit 304
3412 Parksdale Blvd. N.W.
Calgary, Alberta T2N3TN

Defendant, Michael M. Cimino

Richard E. Brodsky, Esq.
Squire, Sanders & Dempsey L.L.P.
200 South Biscyane Blvd., Suite 4000
Miami, FL 33131-2398
rbrodsky@ssd.com

## Civil Cover Sheet Attachment B

**U.S. Securities and Exchange Commission v. Sure Trace Security Corporation et al.**

### IV. Cause of Action

This case is filed under the following civil statutes: 15 U.S.C. § 77v(a) (2006), 15 U.S.C. §§ 78u(d) - (e) (2006), and 15 U.S.C. § 78aa (2006).

This action arises from defendants' violations of the following provisions of the Federal Securities Laws: Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]; and Sections 5(a) and 5(c) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a) & 77e(c)].